## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | NO.  CR-09-0120-HE (01) |
| | ) | |
| WALTER LEE HENDERSON, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Defendant Walter Lee Henderson is charged in a one count indictment with possession of a firearm after a felony conviction, in violation of 18 U.S.C. §922(g)(1).  He filed a motion to suppress evidence seized during a search of his apartment and statements he made in conjunction with the search.  An evidentiary hearing was held on Monday, July 27, 2009.  One of the arresting officers testified, as did the defendant.  The evidence also included an audio recording of a 911 emergency call placed by the defendant at the outset of the encounter with police.  Although there were some factual disputes reflected by the testimony of the two witnesses, the court finds the following facts to have been established by a preponderance of the evidence.

## FACTS

On October 22, 2008, at approximately 3:00 a.m., Oklahoma City police officers Buchanan and Bullard were dispatched to an apartment in Oklahoma City in response to a reported sexual assault.  A minor female had reported that she had been raped by an individual, whom she knew as "P-1," at his apartment.  She gave the apartment's location.

She also indicated she saw a gun in the apartment next to the bed and that she thought it was an AK-47.

When the officers arrived at the apartment, they knocked on the door several times and identified themselves as the police.   In response, and unbeknownst to the officers at the scene, Mr. Henderson called 911 and informed the operator that the police were trying to kick his door in.  At the same time, Mr. Henderson was talking to the officers through his window, indicating he had been sleeping and had not done anything wrong.   Officer Buchanan continued to knock on the door, instructing defendant to open the door as they needed to talk to him about what had happened earlier that evening.  From behind the closed door, Mr. Henderson stated "nothing happened."    As Mr. Henderson appeared to be unwilling to speak to them, Officer Buchanan eventually told defendant they were leaving but that he would be "facing a rape 1 charge later."  At some point, the officer indicated that eventually someone would kick the door in if defendant did not open it.  Officer Buchanan then called his lieutenant to inform him that Mr. Henderson would not speak to them.  While Officer Buchanan was speaking with his lieutenant, and in response to instructions from the 911 operator, Mr. Henderson opened the door.  Office Buchanan then asked Mr. Henderson if he was "P-1" and he responded "that is what they call me."

Throughout his initial interactions with the officers on the scene, Mr. Henderson maintained contact with the 911 operator.  The 911 recording reflects that Mr. Henderson was agitated, frightened, and, at one point, expressed the concern that he would be killed by the officers.  He often stated he was unwilling to open his door for the officers on the scene.

Repeatedly throughout the 911 call, however, the operator instructed Mr. Henderson that he should open his door for the officers.   In response to a request by Mr. Henderson that additional police be dispatched to the scene because of his fear of the officers present, the operator states "Okay, we'll get more people there, but I need you to talk to that officer at the door."

The officers had their weapons drawn when they entered the apartment, but holstered them soon thereafter.  They handcuffed Mr. Henderson for purposes of officer safety and he remained cuffed during the subsequent discussions.   The officers requested identifying information and asked Mr. Henderson if anyone had been at his apartment earlier that evening.  When he said yes, Officer Buchanan asked him if he knew that the female was sixteen.  Mr. Henderson responded by admitting he had engaged in sexual acts with the alleged victim.  Officer Buchanan stopped Mr. Henderson from speaking further and advised him of his <u>Miranda</u> rights.[1]  Mr. Henderson agreed to speak with the officers and discussed his sexual relationship with the girl.

Officer Buchanan asked Mr. Henderson if he had an AK-47 and he said no.  The officer then requested permission to look for the weapon.  Mr. Henderson orally agreed to the officers looking for a weapon and agreed to a search of the apartment.[2]  While Officer

---

[1]*The defendant denied he was ever read his <u>Miranda</u> rights, but the court found the officer's testimony in this regard persuasive.*

[2]*The defendant disputes that he orally consented to the search and claimed one of the officers was searching the apartment prior to any request for permission to search.  The court is persuaded that no "search" occurred prior to the consent apart from a visual sweep of the apartment for others potentially present.  The court found the officer's testimony as to Mr. Henderson's oral*

Buchanan continued to question Mr. Henderson, Officer Bullard searched for the weapon and ultimately located a semi-automatic rifle.   Mr. Henderson admitted the gun was his but continued to insist he had not raped anyone.

After the firearm was found, Officer Buchanan presented Mr. Henderson with a search waiver form, which he read to him and asked him to sign.   Officer Buchanan testified that he informed Mr. Henderson the waiver was necessary before the crime scene investigators could enter the residence to investigate the rape allegation.   Mr. Henderson signed the waiver, again reasserting his innocence as to the rape allegation.

Mr. Henderson has a history of mental illness and was diagnosed as bipolar and schizophrenic several years ago.   He had been recently hospitalized (in a "crisis center" or mental health ward) for that illness and had been released a few days before the incident in question.   The defendant manages his illness through various medications.   Those medications sometimes cause him to be groggy and disoriented.

## DISCUSSION

"The Fourth Amendment protects individuals against unreasonable governmental searches and seizures."   United States v. Pikyavit,  527 F.3d 1126, 1130 (10th Cir. 2008). "A warrantless search of a suspect's premises is unreasonable per se under the Fourth Amendment unless the government shows that the search falls within one of a carefully defined set of exceptions, such as a valid consent."   Eidson v. Owens, 515 F.3d 1139, 1145-

_____

*consent to be credible.*

4

46 (10th Cir.2008) (quoting United States v. Glover, 104 F.3d 1570, 1583 (10th Cir.1997)).

Here, the government maintains the search was justified based on defendant's consent.

Under federal law,[3] consent is valid if it is "freely and voluntarily given."

Schneckloth v. Bustamonte, 412 U.S. 218 (1973).  The validity of consent to search depends

on a factual determination of whether, based on the totality of the circumstances, the consent

was "the product of an essentially free and unconstrained choice by [the] maker" or whether

it was "the product of duress or coercion, express or implied . . . ."  *Id.* at 225, 227.

Voluntariness is "determined from the totality of the circumstances, and the government

bears the burden of proof on the issue.  [T]he government must show that there was no duress

or coercion, express or implied, that the consent was unequivocal and specific, and that it was

freely and intelligently given."  United States v. Iribe, 11 F.3d 1553, 1557 (10th Cir. 1993)

(internal citation and quotations omitted).  Factors which may be considered in determining

the voluntariness of the consent "include physical mistreatment, use of violence, threats,

promises, inducements, deception, trickery, or an aggressive tone, the physical and mental

condition and capacity of the defendant, the number of officers on the scene, and the display

of police weapons."  United States v. Sawyer, 441 F.3d 890, 895 (10th Cir. 2006).

Based on the facts established at the hearing and the totality of the circumstances, the

court concludes that while Mr. Henderson did consent to the search of his apartment, his

---

[3]*"Federal law governs the question whether consent is valid, even though the police actions are those of state police officers."*  *United States v. Sawyer, 441 F.3d 890, 894 (10th Cir. 2006).*

consent was not voluntary within the meaning of <u>Schneckloth</u>.  A number of factors, no one of which is determinative by itself, contribute to that conclusion.  Defendant's contact with the officers occurred in the middle of the night and in a private location where, apart from the investigating officers, he was by himself.  The defendant was resistant to any entry into his apartment by the police and eventually agreed to it only after repeated requests or instructions to do so from both the investigating officers and the 911 operator.  He had been told someone would be back to forcibly enter his house if he did not speak with officers.  He was highly agitated and fearful for his safety, in addition to being confronted with what he (and eventually the officer) viewed as a false charge of rape.  He was approached by officers with guns drawn and, perhaps more importantly, was handcuffed throughout the encounter after the entry by the police.[4]   These factors played out against the backdrop of a defendant who suffered from mental illness, was only recently released from mental health custody, and who appears to have been suffering from paranoid delusions during this particular encounter.[5]   In these circumstances, the government has not carried its burden to show that defendant's consent to search was voluntary and freely given.

In reaching that conclusion, the court does not suggest that the actions of the officers

---

[4]*The fact that defendant was in investigative detention and not free to leave does not, in and of itself, render his consent involuntary.  <u>United States v. Flores</u>, 48 F.3d 467 (10th Cir. 1995).  It is, however, a significant factor in evaluating the overall voluntariness of his consent.*

[5]*In the 911 call, plaintiff insisted that the officers outside his apartment were going to kill him.  Apart from defendant's own statements, there was no evidence of any threat or other improper action by the officers as they sought to talk to defendant.*

were improper or that any deliberate effort to coerce Mr. Henderson was made.  Under the circumstances present here, it was not unreasonable for the officers to approach and enter the apartment with guns drawn or to secure the defendant pending their further investigation, nor was the   nature of their conversations with the defendant objectionable.[6]   It was not unreasonable for the 911 operator to insist that defendant deal with the officers.  Nonetheless, the ultimate question for presents purposes is not whether the officers' conduct was proper or improper but whether Mr. Henderson's consent to search was freely and voluntarily given.  For the reasons indicated, the court concludes it was not.  The totality of the circumstances indicates that defendant's consent to search was the product of duress and coercive circumstances such as to render that consent involuntary within the meaning of the applicable authorities.

Accordingly, their being no asserted justification for the warrantless search of the residence apart from defendant's consent, the defendant's motion to suppress [Doc. #29] is **GRANTED**.  At the trial of this case, the government will be precluded from using any evidence seized in the search of the apartment or statements of the defendant made as a result of the search of the apartment.

---

[6]*The officer's suggestion that someone else would return and "kick his door down" was probably not the best way of suggesting a warrant could be obtained, but conveyed substantially that message.*

**IT IS SO ORDERED**.

Dated this 29th day of July, 2009.

JOE HEATON
UNITED STATES DISTRICT JUDGE